52 So.2d 74 (1951)
MAY
v.
COOPERATIVE CAB CO. et al.
No. 19574.
Court of Appeal of Louisiana, Orleans.
March 12, 1951.
*75 Chas. G. Thomas and Edward A. Haggerty, Jr., New Orleans, for plaintiff-appellant.
Joseph V. Di Rosa and Louis A. Di Rosa, New Orleans, for Cooperative Cab Co., defendant-appellant.
Henry L. Oulliber, Jr. and Robert J. Pitard, New Orleans, for Nola Cabs, Inc., Edwin J. Cassimere, Jr., d/b/a Ed's Cab Service and Harold Smith, defendants-appellees.
JANVIER, Judge.
In an automobile collision between two taxicabs Mrs. June E. A. May, the plaintiff, a passenger in one of the cabs, sustained physical injuries. Alleging that the accident resulted from the joint negligence of the operators of the two cabs, she brought this suit against them and also against the owners of the two cabs and their two insurance carriers, praying for solidary judgment against all.
There was judgment in favor of plaintiff for $5,000 solidarily against the driver of the cab in which she was a passenger, the owner of that cab, and his insurance carrier, and there was additional judgment in favor of plaintiff for $1,500 solidarily against the driver of the cab and the owner. The suit as against the driver of the other cab, the owner thereof, and the insurer thereof was dismissed.
The fees of certain medical experts were taxed as costs and the defendants cast were required to pay all costs.
Plaintiff appealed devolutively and suspensively. The owner of the taxicab in which plaintiff was a passenger and his insurer also appealed devolutively and suspensively.
The accident took place at about 3:30 o'clock on the morning of October 3, 1948, at the intersection of LaSalle and Gravier Streets, in New Orleans. A United Cab, of which Frank G. Klemm was the owner, which was being driven by Douglas Williams, of which Cooperative Cab Company was insurer and in which plaintiff was a passenger, was being driven up LaSalle Street, and the other cab, known as an Ed's Cab, owned by Edwin J. Cassimere, Jr., and driven by Harold Smith, and of which Nola Cabs, Inc., was the insurer, was going in the direction of the Mississippi River on Gravier Street. Each of the two streets is a one-way street, and Gravier Street is what is known as a through street, there being on LaSalle Street a stop sign requiring all vehicles on that street to be brought to a stop before entering the Gravier Street intersection.
The charges of negligence against the two drivers are identical. It is alleged that each was traveling at an excessive and dangerous speed while entering a blind corner intersection in violation of the City Traffic Ordinance No. 13702. It is also charged that each failed to keep a proper lookout; that each failed to see the other cab until the moment of the impact; that each failed to apply his brakes; to blow his horn, or to swerve or to do anything *76 in an effort to avoid a collision, and that each failed to have his car under control.
Each group of defendants charged that the accident resulted solely from the negligence of the operator of the other cab. Each insurer admitted that under the City ordinance, if there was any liability, it would be liable up to the sum of $5,000.
The driver of the United Cab in which plaintiff was a passenger admits that he did not stop his cab before driving it into the intersection, and he says that as it entered the intersection, his speed was about eight miles an hour.
The other cab (an Ed's cab), coming in Gravier Street in the direction of the Mississippi River, had just delivered a passenger at the colored out-patient clinic of the Charity Hospital, the entrance of which was at the top of an automobile ramp. That taxicab had been driven down the ramp into Gravier Street and then to the corner where the accident occurred. The lower end of the ramp down which this other cab, the Ed's Cab, was driven, connected with Gravier Street at a point almost 135 feet from the intersection with LaSalle Street, so that the driver of that cab had driven it down the ramp and then a distance of about 135 feet on Gravier Street before the collision occurred.
It is not seriously contended that the driver of the United Cab was not at fault. In fact counsel for the owner, the operator, and the insurer of that cab say that they appealed because the judgment dismisses the suit against the other group of defendants and because the damages awarded are excessive. The record shows that had that driver stopped before entering the intersection as he should have done, he could, as the district judge found, have seen "for an appreciable distance down Gravier Street." Since he was required to stop before entering the intersection and since, under the provisions of the City Traffic Ordinance No. 13702 C. C.S., the other cab, which was coming from his right, was given the right of way, we have no doubt at all of the correctness of the finding that that driver was at fault and that that fault had causal connection with the ensuing collision. In addition, it appears that the speed of that cab must have been excessive for, after the collision, it proceeded a considerable distance before coming to a stop and then stopped only after it had collided with a lunch stand near the corner and had knocked that stand about six inches off its proper foundation.
However, we have more than grave doubt concerning the freedom from fault of the driver of Ed's Cab. Smith, its driver, said that probably he did not see the other cab because "maybe he didn't have his lights on." But the record shows that the headlights of the other cab were burning.
Smith says that he was operating his cab at about 15 or 17 miles per hour. He claims that he looked at his speedometer as he came down the ramp from the Charity Hospital and that it showed ten miles per hour; that he then shifted into second gear and then into high gear in traversing the intervening 135 feet between the end of the ramp and the LaSalle Street intersection, but that his speed had not reached more than 15 or 17 miles per hour. He was carefully examined as to how often he had looked at his speedometer before that particular time and could not remember that he had looked at it at any particular time, but was certain that just before the accident occurred he had looked at his speedometer and that it registered ten miles per hour. He says that when he looked up, the other cab was right on him and that then he was 38 inches from the corner. He indicated a remarkable ability to be exactly correct in all of his distances and measurements.
The district judge found that though there was a building which apparently was in course of construction on the intervening corner of LaSalle and Gravier Streets, the driver of the United Cab on LaSalle Street could have seen quite a distance out Gravier Street. But it is equally obvious that the driver of the Ed's Cab on LaSalle Street could have seen quite a distance down LaSalle Street had he looked. And had he looked he would have seen the cab, would certainly have noticed that it had not stopped near *77 the corner and that it was about to enter the intersection. If he was driving his own car at the modest speed claimed and not in excess of the speed fixed by the City Traffic Ordinance, he could easily have stopped and no accident would have occurred. As a matter of fact, the record leaves no doubt whatever that Smith approached and entered the intersection at an excessive speed.
The district judge correctly found that under the City Traffic Ordinance the limit at which Ed's Cab should have been operated was fifteen miles per hour and that technically therefore Smith was guilty of violating the provisions of the ordinance by entering the intersection in excess of that speed, but he also found that that provision of the ordinance was enacted for the "protection and convenience of patients of the Charity Hospital," and that therefore the violation by Smith of the provisions of the ordinance could not be pointed to in an accident between persons not patients of the hospital.
We find ourselves unable to agree that this would justify a violation of the ordinance and would relieve the operator of a vehicle violating the ordinance from liability if the record should otherwise show that that violation had causal connection with the ensuing accident.
The record abundantly refutes Smith's testimony as to his modest speed. Several eyewitnesses fixed the speed of the Ed's Cab at a rate considerably in excess of that admitted by Smith. On or near the corner there was a building occupied by the ambulance department of the Charity Hospital and in that building there were several off-duty ambulance drivers. One of them, Seither, says that when he looked out the window, he saw the Ed's Cab approaching at "terrific" speed, and that after the collision and that cab had swerved to its right in an effort to go up LaSalle Street, it went an additional 50 feet or so before being brought to a stop.
Williams, the driver of the United Cab in which plaintiff was a passenger, says that the speed of the other cab was about thirty miles an hour and that the impact was extremely violent.
Hollingsworth, another ambulance driver off duty, says that he saw Ed's Cab before the collision and that when he noticed it, it was going at about 17 to 20 miles an hour.
The district judge found that the witness Hollingsworth was in a better position to see than was the witness Seither, and he therefore concluded that Hollingsworth's estimate of the speed of the Ed's Cab, which was 17 to 20 miles per hour, was more accurate than was the estimate of Seither.
Our examination of the record does not convince us that Hollingsworth was in a better position to see than was Seither and for many reasons we conclude that Seither's estimate of the speed of that cab was more accurate than was Hollingsworth's. In other words, we are of the opinion that the speed of the Ed's Cab was considerably in excess of 20 miles per hour.
In addition to the eyewitnesses, we are much impressed by the fact that after the collision the cab driven by Smith, which had come into violent contact with the United Cab, turned to its right and proceeded up LaSalle Street a distance variously estimated at from 50 to 90 feet before it could be brought to a stop.
As a result of the testimony of the eyewitnesses and after considering the physical facts, we conclude that the Ed's cab entered the intersection at an excessive rate of speed in violation of the City Traffic Ordinance. We also conclude that this excessive speed had direct causal connection with the ensuing collision. As we have already said, it is very evident that if that cab had been operating at a moderate speed and if the driver had been on the alert, he could have avoided the accident even though the other cab entered the intersection without first being brought to a stop.
Our conclusion is that both drivers were negligent and that the negligence of each contributed to the result.
Plaintiff was taken to the emergency room of the Charity Hospital where she remained for six hours. She then was taken to her home and six days later was *78 removed to the Baptist Hospital where she remained under treatment for four days. According to her testimony, she was in bed at home for five weeks. It was found that she had sustained contusions of the back and hip, abrasions of the hand, and two lacerations of the forehead which, at the time of the trial, had practically healed but of which the district judge, in his reasons for judgment, said: "The testimony of the medical experts produced by the plaintiff is that plaintiff has a scar above the hair line one and one-fourth inches long. This scar is not visible. There are two other scars on her forehead, one near the center, two-fifths of an inch long, and the other on the right side of her forehead, one and one-half inches long. This latter scar was still discernible at the time of the trial."
Dr. Maurer described the injuries to plaintiff's forehead as follows: "* * * In the right frontal region there is a biramous scar running diagonally of the forehead, one and a half inches in length. There is a scar branching from this scar running ¾ inch. Running ¾ of its distance to the left, 2/4 of an inch in length. At that time this scar was discernible for a distance of thirty feet. There was also a scar above the hairline to the superior frontal region, one and one-half inches in length. One and one-quarter inches in length. This scar was not disfiguring or unsightly because it was above the hairline."
Plaintiff also sustained a sacroiliac sprain. Dr. Maurer stated that, in his opinion, while her condition was chronic, it would yield to treatment, but that without treatment it would probably continue indefinitely.
It seems now that her principal complaint results from the condition of her nervous system.
To quote from the reasons given by the district judge, Dr. Unsworth, a psychiatrist, said that plaintiff "was suffering from a post concussion syndrome; that she was completely permanently disabled at the time of the trial, and that the chances of the patient's recovering to the same condition she enjoyed before the accident were nil."
Dr. Connelly, another psychiatrist, said that she was suffering from a severe state of anxiety caused by trauma, and that she was in a state of confusion.
Prior to the accident plaintiff had been employed as a packer in a cracker factory and in her work, at which she was an expert, she was required to stand continuously. The president of the corporation which employed her said that in employing her he had. found that she had been previously employed in another factory in the same kind of work and that she was an expert in that work. She was paid $28.60 per week for a 48-hour week.
There is nothing in the record which throws any doubt on the truthfulness of her statement that she lost a total of 76 weeks at $28.60 per week. The district judge found that she lost 76 weeks at $28 per week, making a total of $2,128. We reach a slightly higher weekly figure $28.60 a week, or a total of $2,173.60. Her actual losses in earnings therefore amounted to $2,173.60.
She should be allowed an additional amount for the scars on her forehead, principally the one which, to some extent, remains permanently visible.
The plaintiff was forty-three years of age at the time of the accident. She had been married but her husband had died in 1936 and she had not remarried. Unquestionably the visible scar is to some extent disfiguring. We have given consideration to quite a number of cases in which the amount to be awarded for a face disfigurement has been discussed.
In Teissier v. Stewart, 11 La.App. 164, 121 So. 777, 779, a young girl nine years old was allowed $12,000 for very serious physical injuries of many kinds, including the loss of an eye. We referred to the possible effect of the chances of marriage and said: "It is idle to deny that plaintiff's daughter, with a scarred face and glass eye, will be at a matrimonial disadvantage, and though she may (as we trust she shall) eventually consummate a happy marriage to some worthy and appreciative husband, her opportunities for *79 doing so have been materially affected as a result of her unfortunate accident. Her chances to marry have undoubtedly been circumscribed as a result of her injuries, for which we have found defendant responsible. Has she suffered any injury on this account? The answer must be in the affirmative, notwithstanding certain modern tendencies to which we shall not further allude. A fortunate marriage, a state of connubial felicity, is for man the nearest approach to that which all of us are forever pursuing and never attaining, earthly happiness, but for women it is a measureless benediction."
In Escalante v. Richard, 14 La.App. 579, 130 So. 567, in addition to a scar of about two inches on the arm of a young lady, there were severe cuts on the scalp, but we said that they "are now covered with hair and cannot be seen". We allowed $2,500 for nervous shock and all physical injuries, including the scar.
In Dyess v. Landry, 15 La.App. 403, 132 So. 242, 244, this Court reduced an award to $3,635. In addition to a scar, the plaintiff sustained much pain and suffering, physical and mental shock and nervousness. There we said: "`The plaintiff is a very comely young lady, only twenty-three years of age and unmarried. The scar upon her right cheek appears as shown upon the photograph introduced in evidence and is very noticeable even at a distance of from thirty to fifty feet. There is a discoloration of the skin and the scarred portion of the flesh of the cheek bulges slightly. Dr. Miller testified that the scar is permanent but that its appearance might be improved by plastic surgery, which, of course, would involve an additional operation together with the expense and suffering incident thereto.'"
In Christos v. Manos, 16 La.App. 512, 134 So. 713, the plaintiff, a married woman, sustained a small cut over one eye, a cut under the chin, injury to one arm and considerable nervous shock. The scars were scarcely noticeable. We allowed $1,250 for all the injuries.
In Driefus v. Levy, La.App., 140 So. 259, the plaintiff, a married woman, said that she sustained a cut across the nose, a cut from the eye down, laceration of the right side of the face, and a cut over the left eyebrow and another on the chin. The only permanent result was a slight disfigurement of the nose. She was allowed $2,500.
In Crutsinger v. B. F. Avery & Sons, La.App., 152 So. 361, the plaintiff sustained broken ribs and other injuries and also a scar which, at the time of the trial, was "perfectly healed." It was two inches long on the forehead and near the hair. Three Thousand Dollars was allowed for the disfigurement and disability.
In Cuccia v. White Top Cabs, Inc., La. App., 6 So.2d 358, 360 Judge Westerfield, then Presiding Judge of this Court, discussed many cases in which there were involved disfiguring scars upon the heads or faces of young women. There the scar was very near the hairline and we said: "* * * The scar on Miss Cuccia's forehead may well be disfiguring and within the rule announced in the cited cases, but the proof is very meagre. It is said to be near the hairline which would indicate that its unsightlessness is minimized by its location and its capacity for harm is limited. * * *"
We increased an award of $500 to $1,000 for the scar and other injuries.
In Cali v. Cloverland Dairy Products Co., La.App., 21 So.2d 171, a young woman sustained a cut on the left side of her head just back of the hairline which resulted in a "clearly visible scar". She also sustained cuts and bruises on her face and hands. She was awarded $1,500 for all personal injuries, pain, suffering, scars and disfigurement.
In Mahou v. Employers Liability Assur. Corporation, La.App., 25 So.2d 363, we allowed $2,500 for noticeable, though not disfiguring scars, together with contusions and lacerations of the forehead, the right eye, a fracture of the nasal bone, a rib fracture, and lacerations of the knee and contusions of the body. The plaintiff was a man and in many cases we have recognized the fact that disfiguring scars mean more in the case of a woman than in the case of a man.
*80 In Bonner v. Ouachita Baking Co., Fla., 37 So.2d 543, 544, the plaintiff, a woman, was awarded $1,500 for pain and suffering resulting from a mild brain concussion, severe bruises to the ankles and a small cut over the left eyebrow at the hairline. The Court said: "We appreciate the fact that a permanent scar on a woman's face, no matter how slight it may be, is a matter of the utmost concern to her. * * *"
Our conclusion is that, considering the fact that the plaintiff, at the time of the injury, had already reached 43 years, had already married, and even taking into consideration the increase in the cost of living that is to say, the depreciated value of the dollar, we think that an allowance of $1,000 for the disfigurement is adequate.
When we add the amount of wages lost, $2,173.60, to the $1,000 allowed for the disfigurement, we find that the balance of the award amounts to only $3,326.40 for her pain and suffering and for the possibility of permanent partial disability. Whether she has been permanently partially disabled is not at all certain. In spite of the fact that the doctors produced on behalf of plaintiff unquestionably said that she would be to some extent permanently disabled, the district judge said: "Taking the opinions of all the doctors as a whole with reference to total permanent disability, the most that can be said is that the prognoses are indefinite, and any award in damages based upon them would be speculative."
In an application for rehearing in which they contended that the amount awarded plaintiff was inadequate, counsel for plaintiff averred that three doctors had examined the plaintiff on behalf of some of the defendants and that these doctors had not been placed on the stand as witnesses. Counsel attached to the application for rehearing a document which they averred set forth extracts from the reports of these three doctors, and they argue that since the doctors had not been called as witnesses, there should be accepted as evidence the alleged extracts from the reports of these three doctors. Since the doctors were not called as witnesses and since no reports made by them were offered in evidence, we cannot consider the extracts as a part of the record. However, since no explanation is made of the reason for not placing these doctors on the stand, we think it fair to assume under the usual rule that had they been placed on the witness stand their testimony would not have been advantageous to the defendants.
Of course, the district judge saw the plaintiff and is better able then are we to determine her condition. Among other things, for instance, it is claimed that she sustained a loss of memory. The district judge, on this point, said that he was impressed "with the plaintiff's ability, while on the stand, to recall and to remember without difficulty, events before and after the accident."
However, we cannot avoid the impression that plaintiff had not been allowed a sufficient amount for her pain and suffering and for such permanent disability as may result, and have concluded that the total award should be increased to $8,000.
Of course, the limit of the liability of each of the insurers, Cooperative Cab Company in the case of the United Cab and Nola Cabs, Inc., in the case of the Ed's Cab, is $5,000 as fixed by City Ordinance No. 16605 C.C.S., so that neither can be held liable in excess of that amount.
It is therefore ordered, adjudged and decreed that the judgment, insofar as it runs in favor of Edwin J. Cassimere Jr., Harold Smith and Nola Cabs, Inc., be and it is annulled, avoided and reversed, and that the judgment, insofar as it runs in favor of plaintiff, Mrs. June E. A. May, be amended by the increase of the amount awarded her to $8,000. Accordingly, it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Mrs. June E. A. May, solidarily against Frank G. Klemm, Douglas Williams, Edwin J. Cassimere, Jr., Harold Smith and Nola Cabs, Inc., in the full sum of $5,000, with interest from judicial demand, and that there be additional judgment in favor of Mrs. June E. A. May, solidarily against *81 Frank G. Klemm, Douglas Williams, Edwin J. Cassimere, Jr., and Harold Smith in the full sum of $3,000, with interest from judicial demand.
And it is further ordered, adjudged and decreed that the judgment appealed from, insofar as it fixes the fees of the medical experts, be and it is affirmed; defendants to pay all costs.
Reversed in part, amended and affirmed in part.

On Application for Rehearing.
PER CURIAM.
The defendants, Nola Cabs, Inc., Harold Smith and Edwin J. Cassimere, Jr., have applied for a rehearing asserting that for many reasons our opinion and decree are erroneous and that there should have been no decree against them.
The plaintiffs have also applied for a rehearing on the ground that although in our opinion we said that all of the defendants should be held solidarily liable, Cooperative Cab Company and Nola Cabs, Inc., up to the sum of $5,000, and that the others should be held solidarily liable in the sum of $8,000, in our decree we inadvertently omitted the name of Cooperative Cab Company as one of the judgment debtors solidarily liable up to the sum of $5,000.
Plaintiffs also maintain that the two defendants, Cooperative Cab Company and Nola Cabs, Inc., should be held solidarily liable in the sum of $8,000, although the liability of each is limited under the bonds issued to $5,000. It is asserted that since the entire amount awarded is only $8,000, each of those two defendants would be required to pay only $4,000.
In the first place, if all defendants should be held solidarily liable in the sum of $8,000, the plaintiffs could require any one of them to pay the full amount. Civ. Code art. 2094.
We realize that under the rule announced by the Supreme Court in Quatray v. Wicker, 178 La. 289, 151 So. 208, if one of two or more solidary judgment debtors is forced to pay the entire judgment, that one has the right to force the other or others to contribute on a pro rata basis. This results largely from the effect of Article 2103 of our Civil Code. But that does not give the solidary judgment debtor against whom the judgment is sought to be enforced the right to force the judgment creditor to proceed against all and to obtain from each only a pro rata share. The rule announced in Quatray v. Wicker is applicable between the solidary judgment debtors and in no way limits the right of the judgment creditor to proceed for the full amount against any one of the solidary judgment debtors. Therefore if we should hold Cooperative Cab Company and Nola Cabs, Inc., solidarily liable for the entire amount$8,000 the plaintiffs might enforce collection from either of them of that amount, though neither is liable for more than $5,000. The fact that that one which might be required to pay the entire judgment could then attempt to collect on a pro rata basis from the other does not alter the situation. For an interesting discussion of the effect of the rule followed in Quatray v. Wicker, supra, see TortsNegligence Contribution between Co-Tort-Feasor, 1 L.L.R. 235, 9 T.L.R. 125, TortsJoint Tort-Feasors ContributionArticles 2103, 2324, Louisiana Civil Code of 1870.
We find no reason to grant a rehearing on any ground, but shall merely amend our decree so as to include as a solidary obligor, up to the sum of $5,000, Cooperative Cab Company.
It is therefore ordered, adjudged and decreed that our original decree is recalled and annulled, and it is now ordered, adjudged and decreed that the judgment, insofar as it runs in favor of Edwin J. Cassimere, Jr., Harold Smith and Nola Cabs, Inc., be and it is annulled, avoided and reversed, and that the judgment, insofar as it runs in favor of plaintiff, Mrs. June E. A. May, be amended by the increase of the amount awarded to $8,000.
Accordingly, it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Mrs. June E. A. May, solidarily and against Frank G. Klemm, Douglas Williams, Edwin J. Cassimere Jr., *82 Harold Smith, Nola Cabs, Inc., and Cooperative Cab Company in the full sum of $5,000, with interest from judicial demand, and that there be additional judgment in favor of Mrs. June E. A. May, solidarily against Frank G. Klemm, Douglas Williams, Edwin J. Cassimere, Jr., and Harold Smith in the full sum of $3,000, with interest from judicial demand.
And it is further ordered, adjudged and decreed that the judgment appealed from, insofar as it fixes the fees of the medical experts, be and it is affirmed; defendants to pay all costs.
Original decree amended; both applications for rehearing denied.